UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
                                                :

UNITED STATES OF AMERICA,

                                                :    Case No. 18-cr-518 (LAK)

     v.

                                                :

WOOJAE JUNG,

                                                :

          Defendant.

                                              :
------------------------------------- X

### <u>DEFENDANT WOOJAE JUNG'S SENTENCING MEMORANDUM</u>

SMITH VILLAZOR LLP
Patrick J. Smith
Nicholas J. Karasimas
250 West 55th Street, 30th Floor
New York, New York, 10019
(212) 582-4400

*Attorneys for Defendant Woojae Jung*

Dated: May 28, 2019

## **TABLE OF CONTENTS**

Page

I.   PRELIMINARY STATEMENT ................................................................... 2

II.  PROCEDURAL HISTORY............................................................................ 3

III. THE OFFENSE CONDUCT .................................................................... 3

IV. THE PROBATION DEPARTMENT'S RECOMMENDATION ................................... 6

V.  STEVE JUNG'S PERSONAL HISTORY AND CIRCUMSTANCES ........................... 7

    A.  Mr. Jung's Upbringing & Education ........................................... 7

    B.  Mr. Jung's Relationship with His Brother ................................. 11

    C.  Mr. Jung's Marriage.................................................................... 13

    D.  Mr. Jung's Career........................................................................ 15

    E.  Post-Arrest Career Developments................................................ 17

    F.  Mr. Jung's Character................................................................... 20

    G.  Specific Immigration Circumstances.......................................... 26

VI. A SENTENCE OF TIME SERVED IS SUFFICIENT BUT NOT GREATER
    THAN NECESSARY IN THIS CASE............................................................ 28

    A.  Federal Sentencing Framework ................................................. 28

    B.  Mr. Jung Accepts the PSR's Advisory Guideline Calculation ................................. 30

    C.  The PSR Recommends Time Served ........................................... 30

    D.  A Downward Variance from the PSR's Guidelines Calculation is Warranted
        Under Title 18, United States Code, Section 3553(a)................................. 31

        1.   Mr. Jung's Personal History and Characteristics Warrant Downward
            Variance ....................................................................... 31

        2.   The Offense Conduct Did Not Result in Personal Gain to Mr. Jung............. 33

        3.   The Offense Conduct Is Inconsistent with "Typical" Insider Trading ......... 34

        4.   A Sentence of Time Served Satisfies Federal Sentencing Objectives
            Under 18 U.S.C. § 3553(a)(2).......................................................... 35

i

**TABLE OF CONTENTS**
**(continued)**

Page

CONCLUSION.............................................................................................................................. 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Gall v. United States,*
    552 U.S. 38 (2007) ............................................................................................... 28, 29

*Kimbrough v. United States,*
    552 U.S. 85 (2007) ............................................................................................... 28, 29

*Nelson v. United States,*
    555 U.S. 350 (2009) ................................................................................................... 28

*Rita v. United States,*
    51 U.S. 338 (2007) ............................................................................................... 28, 29

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ....................................................................... 21

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008) ................................................................................. 28, 29

*United States v. Collado,*
    2008 WL 2329275 (S.D.N.Y. June 5, 2008) .............................................................. 28

*United States. v. Davis,*
    No. 07 Cr. 727, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) ..................................... 28

*United States v. Dorvee,*
    616 F.3d 174 (2d Cir. 2010) ...................................................................................... 29

*United States v. Emmenegger,*
    329 F. Supp. 2d 416 (S.D.N.Y. 2004) ....................................................................... 35

*United States v. Jones,*
    460 F.3d 191 (2d Cir. 2006) ...................................................................................... 29

*United States v. Oakford Corp.,*
    79 F. Supp. 2d 357 (S.D.N.Y. 1999) ......................................................................... 33

*United States v. Stuart,*
    22 F.3d 76 (3d Cir. 1994) .......................................................................................... 33

*United States v. Walters,*
    87 F.3d 663 (5th Cir. 1996) ....................................................................................... 33

## TABLE OF AUTHORITIES
### (continued)

Page(s)

**Statutes**

18 U.S.C. § 3553(a) .................................................................................................... *passim*

## I.   PRELIMINARY STATEMENT

We submit this sentencing memorandum on behalf of Woojae "Steve" Jung to aid the Court in its determination of a fair and just sentence in this case.  As this memorandum illustrates, Mr. Jung is a man of outstanding character who crossed the line in a misguided attempt to help someone close to him.  Perhaps the best indication of his character may be the way he has responded to this criminal case and all that comes with it.  His conduct threatened his family and personal relationships.  His promising investment banking career dissolved instantly, with no realistic prospects for future employment in the financial services industry.   No matter what happens at sentencing, his conduct has already placed everything he worked and planned for his entire life irretrievably out of reach.   Given his immigration status, his future in the United States is at best uncertain.  This might ruin a lesser person – maybe most people.  But to his immense credit, Mr. Jung's response has been inspired.  He has doubled down on his lifelong commitment to working hard and treating others with kindness and generosity.   Above all, he has remained a steady and loving husband, son, brother, and friend.

The unique strength of Mr. Jung's character is clear from the outpouring of letters (56 in total) of support submitted on Mr. Jung's behalf from family, friends, and colleagues near and far. As we describe further below, these letters paint a picture of a man who is, above all else, selfless. These letters show that Mr. Jung goes out of his way to help those around him and describe a charismatic person who builds bridges and brings joy and comfort to others.  As we describe below, it was Mr. Jung's misguided desire to help his younger brother that led him to share material non-public information that was not his to share.

The Probation Department recommends a sentence of time served, a three-year term of supervised release, and community service.  Presentence Investigation Report ("PSR") at 19.  The

PSR's recommendation is sensible and well-reasoned: even with a limited window into Mr. Jung's life, the Probation Department appropriately recognized that imprisonment is not necessary in this case. As the Court knows, it is quite unusual for the Probation Department to recommend no incarceration when the advisory Sentencing Guidelines suggest a range of 18-24 months. The combination of factors here, including the absence of calculated exploitation of valuable inside information, readily justify the Probation Department's recommendation. We respectfully submit that this Court should come to the same conclusion.

## II.   PROCEDURAL HISTORY

On November 2, 2018, a grand jury in the Southern District of New York indicted Woojae Jung on one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count 1), and six counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78(ff), 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (Counts 2-7) (the "Indictment"). On December 19, 2018, Mr. Jung entered a plea of guilty to Count Five of the Indictment before Magistrate Judge Debra C. Freeman, pursuant to a plea agreement with the government. Mr. Jung's guilty plea was accepted by Your Honor on January 28, 2019, and sentencing is scheduled for June 10, 2019.

## III.   THE OFFENSE CONDUCT

The offense conduct is set forth briefly in the PSR. While we do not object to any fact that has a direct impact on the PSR's Guidelines calculation, to which Mr. Jung stipulated and fully accept, we believe it would be useful to provide the Court with additional context. We submit that the following description of the offense conduct, which comes from the PSR as well as the Statement of Offense Conduct that was submitted to the Probation Department (attached as Exhibit A), is accurate and should guide the Court in determining an appropriate sentence.

3

In July 2012, Woojae Jung began working as an investment banking associate in the Natural Resources group at Goldman Sachs ("Goldman"), in New York.  PSR ¶ 13.  In late August of 2015, Mr. Jung transitioned to Goldman's Technology, Media, and Telecommunications Group in San Francisco, California, and on January 1, 2016, was promoted from associate to vice president.  *Id.*  Mr. Jung remained in this position until June 15, 2018. Mr. Jung held a Series 79 license during the relevant period.  *Id.*

As an investment banker at Goldman, Mr. Jung was staffed on various transactions, primarily mergers and acquisitions ("M&A deals").  PSR ¶ 14. Sometimes Mr. Jung worked on behalf of the acquiring company and sometimes on behalf of the target company. Mr. Jung's clients were often public companies.  *Id.*

On any given M&A deal, Mr. Jung typically worked within a team of other Goldman bankers, often referred to as the "deal team." PSR ¶ 15.  The deal team was tasked with advising the firm's client in connection with a potential transaction.  *Id.*  Among other things, this involved reviewing and analyzing various financial and operational data and information.  *Id.*  As a result, in the regular course of his work, Mr. Jung was exposed to material, non-public information about companies, including that they were working to acquire other companies or were acquisition targets themselves.  *Id.*  At all times during the relevant period, Mr. Jung understood that Goldman had policies in place that required him to keep information about the firm, its clients, and upcoming transactions confidential.  *Id.*

Starting in early 2015, Mr. Jung began to discuss trading strategies with his younger brother, who lived in South Korea.  PSR ¶ 16.  Mr. Jung's younger brother was going through a challenging period: he lived with his parents, had no income other than a small stipend, and was mired in debt in part due to a serious gambling problem.  Exhibit A at 2.  Mr. Jung's younger

4

brother had even stolen money from his parents and had become a financial risk and a cause of tension and strife among the family.  *Id.*  Mr. Jung perceived his brother as unmotivated and depressed.  *Id.*  While Mr. Jung's brother had talked about a career in finance, from Mr. Jung's perspective, he was not taking concrete steps to develop the necessary skills and experience.  *Id.*

While Mr. Jung had tried to be a mentor and to help his brother in the past, including by gifting him money, he decided to engage more directly to try and help his brother and his family. *Id.* Mr. Jung tried to engage and motivate his brother by discussing potential trading strategies that his brother could execute.  *Id.*  Mr. Jung hoped that his brother would become engaged in something useful and productive through learning how to trade, but also hoped that his brother would make money through the execution of these strategies.  *Id.*  They discussed technical theories behind certain trading strategies, including volatility strategies that involved the trading of put and call options around earnings announcements, and advice about how to execute these strategies.  *Id.*

In addition to discussing strategies, Mr. Jung gave his brother the names of certain companies in sectors Mr. Jung knew best.  *Id.*  Mr. Jung recommended that his brother research those companies for potential trading pursuant to the strategies that the two had discussed.  *Id.* Some of these companies were Goldman clients, others were not.  *Id.*  Some of the Goldman clients discussed were later involved in M&A discussions, and others were companies that were involved in M&A discussions with Goldman clients.  *Id.*

Instead of stopping discussions about trading strategies as it related to these companies once he became aware that a deal might occur, Mr. Jung continued to engage in such discussions. *Id.* at 3. While Mr. Jung did not provide specific deal information, these discussions provided his brother with a trading advantage, and Mr. Jung intended that his brother trade profitably in the

5

securities of the companies discussed.  *Id.*  Mr. Jung knew that these conversations were prohibited and that his brother might use the confidential information to make trading decisions.  *Id.*

Among other things, Mr. Jung pointed out news articles about companies that he knew might be involved in M&A deals, discussed why such companies were good candidates for trading, refocused his brother on such companies, and otherwise encouraged his brother to conduct additional research and consider such companies as part of the trading strategy.  *Id.*

The specific transactions included in the offense conduct are outlined in the PSR.  PSR ¶ 17.  Gross profits from the transactions at issue (which relates to trades in eleven companies) range from $362 to $64,000 for individual trades, and total $130,000 for all trades.  PSR ¶ 18.  Mr. Jung has not received any of these trading profits, which remain in the account used to conduct the trading, which is not in Mr. Jung's name.

## IV.   THE PROBATION DEPARTMENT'S RECOMMENDATION

The final PSR recommends a sentence of time served, a two-year period of supervised release with 240 hours of community service, and a $30,000 fine (in addition to a $100 special assessment and forfeiture as described in the plea agreement).  PSR at 19.  The PSR's recommendation is a significant downward variance from the range that would result from application of the Sentencing Guidelines.  In justifying this recommendation, the PSR explains that the offense conduct is an aberration, and that Mr. Jung has already suffered severe consequences:

> Aside from his involvement in the instant offense, Jung has led a law-abiding lifestyle. While the offense occurred over an extended period of time, it appears this was more of an aberration, rather than the defendant displaying a criminal mindset. Due to his conviction, the defendant has squandered years of hard study in school, tireless years of professional development, and forfeited his ability to work in what was a promising and lucrative career in banking. All for, when

compared to his banking income and potential future earnings, relatively modest insider trading gains.

PSR at 20.  The PSR notes that Mr. Jung is "too smart not to know" that what he was doing was illegal, but goes on:

> That said, Jung has already used his strong educational and professional background, as well as his motivation and resilience to reinvent himself and start his own business. His presentence rehabilitation also includes charitable work, and overall, it has been impressive. Jung also benefits from the support of his spouse. We believe Jung poses little risk of recidivating and that the seriousness of this crime can be sufficiently accounted for by non-custodial forms of punishment, namely a significant monetary fine, and a substantive community service requirement. Community service is an important component of this sentence, it will allow Jung to continue to make reparations to the community for his criminality, instill upon him the virtues of empathy and selflessness, and further impress upon [him] the seriousness of his conduct.

*Id.*  The Probation Department believes that its recommended sentence is "sufficient, but not greater than necessary to comply with the sentencing purposes found in 18 U.S.C. § 3553(a)(2)." *Id.*

## V.    STEVE JUNG'S PERSONAL HISTORY AND CIRCUMSTANCES

### A.  Mr. Jung's Upbringing & Education

Steve Jung was born in Seoul, South Korea on March 16, 1981.  His father, Yeon Bo Chung is a retired professor and scientist, and his mother, Hyeran Yang, is a retired professor and pianist. They are both 64 years old and live together in Seoul.  Mr. Jung has one brother, Sean Jung, age 31, who also lives in Seoul and now works as a data-scientist at a Korean bank.

Mr. Jung split his childhood between the U.S. and South Korea.  His family first moved to Rochester, New York when Mr. Jung was two years old so that his father could pursue his PhD at the University of Rochester.  When Mr. Jung was 7, the family moved to Boston.  In Boston, Mr. Jung's father worked as a post-doctorate student researcher at Harvard Medical School, while his mother attended graduate school at the New England Conservatory.  Mr. Jung attended Hardy and Northwest Elementary School outside of Boston, where he was well liked by his teachers, his

peers, and their parents.  His character was evident even at a young age.  Mr. Jung's mother recalls

that in elementary school, the students were asked to record how much they read each day, and

that Mr. Jung would "never exaggerate the time by even five minutes."  Ex. C at 7, Letter from H.

Yang.[1]  With both parents either working or in school, Mr. Jung spent many afternoons at a local

Boys and Girls Club.  When Mr. Jung's mother would pick him up, the volunteer staff would

comment on what a good kid Mr. Jung was.  *Id.*  The family did not have a lot of extra money at

the time, so Mr. Jung would spend afternoons picking up recyclables and exchanging them for

pocket money.  *Id.*

      In 1992, when Mr. Jung was eleven, the family moved back to South Korea.  At this time,

Mr. Jung did not speak Korean fluently.  As a result, while he had been a straight-A student in the

U.S., he initially struggled academically in South Korea.  Mr. Jung faced that challenge with the

same methodical and diligent approach that he brings to any task, "learning words one at a time

with several dictionaries open in front of him."  Ex. C at 8, Letter from H. Yang.  More broadly,

he has succeeded academically because he is an extremely diligent worker.  His mother recalls that

in middle school, Mr. Jung would do homework late into the night, including tedious projects like

sewing and carpentry, and would refuse any offers of assistance.  *Id.* at 7.

      Ultimately, Mr. Jung excelled in high school in South Korea.  He finished at the top of his

class, and was an avid athlete, leading the class volleyball team and winning first place in the

school's half marathon.  As one high school friend recalls, Mr. Jung won a nationwide, televised

quiz competition as team captain.  Ex. C at 66, Letter from G. Kim.  After finishing in the 99th

percentile of the national college entrance exam, Mr. Jung went on to attend Seoul National

University, where he double majored in Business and Economics.  Seoul National University is

---

[1] Letters from Mr. Jung's family and friends are attached to this submission as Exhibit C.

the most prestigious university in South Korea, and its student body is known to compete fiercely for post-graduate opportunities.  *See* Ex. C at 52, Letter of S. Shim ("In South Korea, there is a saying that sleeping four hours will lead to rejection, whereas sleeping three hours will lead to admission to our alma mater, Seoul National University.  Admission to Seoul National University by itself translates into instant credibility of his intelligence and diligence in our home country, and I've always perceived Steve as part of the cream of the crop.")

Despite the competitive environment, Mr. Jung was known for helping classmates by sharing notes, assisting them with coursework, and sharing information on employment leads. That his son was so decent in such a competitive environment was a point of pride for his father when these stories were relayed to him at Mr. Jung's graduation ceremony in 2003.  Ex. C at 14, Letter from Y. Jung.  As a friend from college noted, "[u]nlike most people with Type A personalities commonly found in [highly competitive environments], Woojae is the type of person who spends time listening to the needs of others and assisting them selflessly without expecting anything in return."  Ex. C at 120, Letter from Y. Baek.

After university, Mr. Jung worked for a number of Korean companies.  Military service is compulsory for men in South Korea, and Mr. Jung completed his service by working at two state-sponsored Korean technology companies for a period of three years.  After completing this service, Mr. Jung moved to Hong Kong to work at McKinsey & Co.  After working for a few years, Mr. Jung embarked on his next big step, moving to Philadelphia to attend the Wharton School of Business in 2010.

To say that Mr. Jung was well liked at Wharton would be an understatement.  Many of the letters in support submitted with this memorandum come from close friends Mr. Jung made while attending business school.  Once again amidst a cut-throat environment, Mr. Jung prioritized

9

bringing people together and building real friendships. As Jack McCambridge, who met Mr. Jung on the first day of business school put it, while "the popular reputation that relationships in business school are frequently transactional and shallow is completely deserved . . . Steve created meaningful, committed and deep relationship[s]." Ex. C at 37, Letter from J. McCambridge. Another friend from business school, Mckenzie Lock, explains that when she was struggling to adjust to business school and other classmates "looked down on [her]" and "made fun of [her] behind her back," Mr. Jung "went out of his way to make me feel welcome and help me succeed." Ex. C at 46, Letter from M. Lock. Ms. Lock says that she "couldn't have gotten through [her] first year without Steve." *Id.*

Mr. Jung showed himself to be a natural leader at Wharton. Mr. Jung was elected President of Wharton's Technology Club, and one member explained that Mr. Jung "embodied the nerdy optimism and friendliness of the club." Ex. C at 89, Letter from J. Stein. Matt Kane, a friend from Wharton, explains that as leader of the Technology Club, Mr. Jung recruited alumni and business leaders to campus or information sessions and interviews, which resulted in "a record number of internships and full-time offers in Technology for Wharton graduate students," despite the fact that Mr. Jung already had an internship and full-time offer lined up at Goldman. Ex. C at 102, Letter from M. Kane.

As Mr. McCambridge describes, Mr. Jung also served as the de facto captain of the intramural hockey team: "I don't think Steve had ever ice-skated previously. But, with his characteristic enthusiasm, ever-present smile, and encouragement, he charged out on to the ice every game actively emboldening others to do so." Ex. C. at 37-38, Letter from J. McCambridge. Mr. Jung also took a leadership role in the Korean Student Association, where he "led initiatives for MBA students to take on mentorship roles for undergraduate students and personally helped

10

international Korean students acclimate to US culture and environment" to help them adjust and thrive.  Ex. C at 40, Letter from J. Liu.  Finally, a number of friends recall that Mr. Jung was a stabilizing presence on various international trips during graduate school, always on the lookout for the well-being of others.  *See, e.g.*, Ex. C at 77, Letter from J. Kang ("He was the one who [would] always plan ahead, take care of sick people, and ask around [about] individual[s] well-being, although he was in the same boat with us as first-time visitors to these countries.")

**B.  Mr. Jung's Relationship with His Brother**

When Mr. Jung was just a child, he often had to look after his younger brother because his parents were very busy.  As their father observed, Steve "was always a strong supporter of his younger brother," and has always looked after him "with a sense of responsibility somewhat like a parent."  Ex. C at 15, Letter from Y. Jung.  Mr. Jung's mother described him as a godsend to two young, busy parents in a foreign country, recalling, for example, that when Mr. Jung would play with his friends outside, "he would often have his younger brother sitting beside him in a stroller."  Ex. C at 8, Letter from H. Yang.

As an adolescent and through his young adulthood, Mr. Jung was able to adapt to his surroundings and thrive.  His brother, however, found it more difficult, and did not get along as well with their parents.  Ex. C at 8, Letter from H. Yang.  Mr. Jung did his best to help his younger brother, often serving as a go-between, or taking it upon himself to solve his brother's problems.  Countless times, Mr. Jung has come to the rescue of his younger brother.  For example, in 2005, Mr. Jung's brother wanted to take the SATs, but as the date approached, found out that he had missed the application date for one of the last exams available that year.  This mistake would have prevented Mr. Jung's brother from attending college in the U.S. as planned the following fall.  Mr. Jung immediately made the problem his own.  Ex. C at 15, Letter from Y. Jung.  Mr. Jung's high

school served as one of the official test-taking centers, and Mr. Jung had kept in touch with the staff there.  Mr. Jung reached out to see if there were any seats available and was told there might be some on standby on the day of the test.  Mr. Jung drove his brother to the school early in the morning on the day of the test, waited in line with him, and his brother was fortunate enough to secure a seat.  This is but one specific example of Mr. Jung helping his brother.  There are many others, including helping his brother secure summer internships and helping to pay for his brother's college tuition after the 2008 financial crisis put his parents in a difficult financial situation.  Ex. C at 8, Letter from H. Yang.

It is not remarkable, as between two siblings, that one is perceived to thrive while the other experiences difficulties.  But what is remarkable is the way that Mr. Jung has, from a very young age, taken his brother under his wing, protected him, and sought to help him forge a path.  This has been particularly important given the tension between Mr. Jung's parents and his younger brother; in many respects, Mr. Jung has been the glue that has held the family together.

Ultimately, both parents feel a deep and tragic regret for what has happened.  They believe their errors, inadequacies, and reliance on Mr. Jung to care for his brother and solve his problems have led to this situation.  They believe that had their relationship with Sean been different, this situation may have been avoided.  While the relationship between the two siblings is relevant to understanding the instant offense, Mr. Jung has no interest in placing blame on his parents (or his brother), all of whom he loves dearly.  Mr. Jung recognizes his failing as his own.  But it is striking and heartbreaking when his mother writes: "I would have nothing more to wish for if I could be punished 100 times over so that Woojae can have the opportunity to contribute again to society." Ex. C at 9, Letter from H. Yang.

### C.  Mr. Jung's Marriage

Mr. Jung's Wharton degree led him to a successful investment banking career, but the most important thing that happened to Mr. Jung at Wharton was meeting Yeon Jin (Janice) Jung, whom he married in 2013.  Ms. Jung is 29 years old and works as a research manager at Facebook.  Ms. Jung was also born and raised in South Korea and moved to the U.S. when she was 15 to attend boarding school in Pennsylvania.  She went on to the University of Pennsylvania where she earned an undergraduate degree in psychology.  She stayed at the University of Pennsylvania for a PhD program, and was introduced to Mr. Jung through mutual friends.

Ms. Jung's letter describes a sweet and caring husband who makes it his mission to show his devotion in ways large and small.  *See* Ex. C at 1, Letter from J. Jung.  Mr. Jung is the first to apologize, whether he is right or wrong.  *Id.*  He does the lion's share of the chores, and tells his wife that this is fine, because he simply "enjoys it more" than she does.  *Id.*  He is attuned to her every preference, and sensitive to her every need.  He "keeps a mental note of what I like vs. dislike in every dimension possible so that he provides me the best experience every time" and has told his wife that his "lifelong hobby is finding what [she] enjoys."  *Id.*

When Ms. Jung was still in Philadelphia and Mr. Jung was working in New York, he would often travel to see her, even when it meant that he would need to take a 6:00 a.m. train back to New York for work in the morning.  "His banker friends often talk about how they have no free time.  He, on the other hand, would take a cheap bus to where I am and often surprise me by knocking on the door of my cubicle/home."  *Id.* at 3.  When Ms. Jung decided she did not want to complete her PhD program and found a job opportunity in San Francisco, Mr. Jung readily agreed to move with her, despite his successful career at Goldman's New York office and his large network of friends in New York.  *Id.*  Ms. Jung, and the couple's many mutual friends, took note

of Mr. Jung's sacrifice.  *See* Ex. C at 57, Letter from Arya Abedin ("Steve's personal and professional network were based in New York, and he had spent years developing relationships in the group and among the clients he had served since he graduated, but when his wife found the right opportunity for her on the other side of the country in California, Steve said that he would find a way to relocate.  In doing so, he left most of what he had built for the benefit and support of his wife.")  Ms. Jung notes that Mr. Jung made this risky decision without hesitation and has never once complained.  Ex. C at 3, Letter from J. Jung.

Ms. Jung has ████████████████, but with Mr. Jung by her side, she feels happy and healthy.  To Ms. Jung, Mr. Jung is "the first human being in my life who truly accepted" her for who she was.  *Id.* at 3.  He is her rock, and she does not know "how to sustain every day without" the "care and support" that he provides.  *Id.* at 5.  Ms. Jung's parents are also keenly aware of the impact Mr. Jung has had on their daughter, describing with sincere gratefulness the ways in which Mr. Jung cares not just for her but for the whole family, giving them a sense of security.  *See* Ex. C at 20, Letter from M. Eom and T. Jung.  As described further below, Ms. Jung's parents are deeply concerned that any separation from Mr. Jung will be extremely damaging to their daughter.  *Id.* at 21.

The pain and stress the present situation has caused his family, and especially his wife, is far and away the worst consequence for Mr. Jung.  As a friend that knows the couple well put it, even though these events have "devastated Steve's career and credibility," "the worst of it for Steve is the uncertainty around if/when he and Janice will be able to start trying for a child."  Ex. C at 42, Letter from Jessica So.

Despite the terrible situation before them, Ms. Jung describes how their marriage grows stronger, through a commitment to personal development, and that Mr. Jung is utilizing his "can-

do spirit" to work "extra hard to pay for his mistakes to society."  Ex. C at 4, Letter from J. Jung.

Mr. and Ms. Jung get joy out of volunteering and donating to those less fortunate, and in requesting

leniency, Ms. Jung says that it is her "wish that Steve will be able to see the light of the goodness

he has shown to the people around him, ranging from the compassion he has shown to other people

to the practical help he has provided to the non-profits and underprivileged individuals."  *Id.* at 5.

### D.  Mr. Jung's Career

After fulfilling his obligation to South Korea through his three years of alternative service

with Korean technology companies, Mr. Jung moved to Hong Kong and worked as a management

consultant for McKinsey, where he was employed from August 2007 until July 2010.  Mr. Jung

was a standout at McKinsey.  He joined as a business analyst (an entry-level consulting position)

but in less than a year, after the first performance review cycle, he was promoted to associate.  This

is the position that a post-MBA graduate would hold.  One of the individuals involved in hiring

him recalled that Mr. Jung received performance reviews reserved for the top 5 – 10% of

employees and was a supportive team member that was respected by both his superiors and his

juniors.  Ex. C at 69-70, Letter from J. Ahn.  A former colleague and friend from McKinsey,

Michael Poon, recalls a work-trip to Korea during which, despite working long-hours, Mr. Jung

(as the only Korean speaker in the group) organized a memorable weekend trip to Jeju Island

(known as the "Hawaii of Korea") for the team, operating as tour-guide, translator, and driver.  Ex.

C at 104, Letter from M. Poon.  Shepherding a large group of people during a work-adjacent trip

could cause a person to lose patience, but "Steve always kept his smile and was always trying to

help."  *Id.* at 105.

After getting his MBA, Mr. Jung joined Goldman in New York as a junior investment

banker in the Natural Resources Group.  A few years later, when Ms. Jung found a career

opportunity in California, Mr. Jung transferred to Goldman's Technology, Media, and Telecommunications Group in San Francisco in August 2015.

Junior investment bankers work grueling hours and face immense pressure.  Jeff Liu, who met Mr. Jung at Wharton and worked with him at Goldman, explains how he relied on Mr. Jung to face the stress of their demanding schedules:  "Whenever I was feeling down, Steve was always there to encourage me and help me in any way possible.  He was the one who pushed me to go to the gym with him daily so that I could mentally and physically reset myself before continuing with the daily grind….I know that without Steve, I never would have been able to make it through my years as Goldman and for that I am eternally grateful."  Ex. C at 40-41, Letter from J. Liu.

Mr. Jung was not just a resource for his close friends and colleagues during this period.  He continued to go the extra mile through engagement in additional job-related activities.  As an example, Mr. Jung served as a recruiting leader for his alma mater at Goldman.  This was a time consuming role that Mr. Jung "undertook with little or no reward because he believed it was important to help people though the intensive months long recruiting process, build a pool of talent, and pay it forward to MBA students looking to make a career transition just as Steve had done when joining Goldman."  Ex. C at 30, Letter from B. Clapp.

Most striking about Mr. Jung's career is the number of other people's careers he worked to enhance along the way.  The letters of support are replete with examples of Mr. Jung mentoring, nurturing, and supporting his colleagues and friends in their careers.  Dozens of people have looked to Mr. Jung as a resource and sounding board.  Ex. C at 79-80, Letter from Jisoo Ahn (describing that Mr. Jung spent "dozens of hours" preparing him for interviews that led to a successful career change that would "not be possible" without his help); Ex. C at 90, Letter from S. Park ("During my tenure at Goldman Sachs, [Mr. Jung] would actively carve time out of his busy schedule to

check in with me to make sure that I was doing well and give me insightful advice."); Ex. C at 111, Letter from R. Sternberg (Steve…was one of the few people I encountered during my time at Goldman Sachs who seemed genuinely invested in my career more broadly.").  For others, Mr. Jung's impact has been even more direct.    Ex. C at 31, Letter from B. Clapp ("I may not have become a Goldman Sachs banker without Steve's direct intervention."); Ex. C at 112, Letter from R. McMorrow ("I credit much of my personal success both in and out of Goldman to Steve's selfless commitment to sharing his knowledge to ensure others' success.").

### E.  Post-Arrest Career Developments

Goldman terminated Mr. Jung on June 15, 2018, after his arrest.  In an instant, the career that Mr. Jung worked so hard to build had been functionally eviscerated.  Although his career had been derailed, Mr. Jung picked himself right back up, and what he has done since is nothing short of extraordinary.

Soon after he was fired, Mr. Jung founded a consulting business that he operates out of his home.  Mr. Jung provides consulting services for small and medium-sized businesses.  Among other things, Mr. Jung helps companies build financial models, create presentation materials, and generally advises them on how to grow and thrive.  Mr. Jung leverages years of investment banking, management consulting, and business experience and offers companies the kind of expertise that would otherwise not be available to them.

Robert Seo, a United States Marine combat veteran, describes that after selling his own start-up, he collaborated with Mr. Jung's consulting business.  Ex. C at 26, Letter from R. Seo Letter.  Mr. Seo and Mr. Jung have been close friends since Wharton, and Mr. Seo was "very concerned about how [Mr. Jung] would rebound," but when Mr. Jung told Mr. Seo about his consulting company, Mr. Seo was "surprised at how quickly he had been able to find another

avenue to contribute to society, but not surprised by his resilience." *Id.* Mr. Jung asked Mr. Seo if he wanted to work with him, and Mr. Seo "jumped at the chance" as he "loved that [Mr. Jung] was empowering small startups and was excited to work with someone as brilliant as he is." *Id.* Mr. Seo and his wife recently had their first child, so collaborating with Mr. Jung provides an important source of extra income for the family, and Mr. Jung even offered to split earnings from consulting engagements with Mr. Seo equally, despite the fact that Mr. Jung founded the company. *Id.* at 26-27.

Multiple letters in support of Mr. Jung come from small-business owners that have engaged Mr. Jung, but there is perhaps no more compelling story than the one told in a letter from entrepreneur Marc Beginin. Mr. Beginin describes hiring Mr. Jung in August of 2018, when his company was in desperate need of a consultant to help with a pitch deck ahead of meetings with venture capital investors. *See* Ex. C at 28, Letter from M. Beginin. Mr. Beginin found Mr. Jung online, saw his credentials, and thought "this guy is way overqualified." *Id.* Mr. Beginin then saw the allegations of insider trading against Mr. Jung but contacted him anyway; as a former criminal defense lawyer, Mr. Beginin knew that "good people do foolish things." *Id.* The two discussed a potential engagement, Mr. Jung was transparent about his legal situation, and Mr. Beginin decided to give him a chance. *Id.* Mr. Beginin was soon rewarded, as Mr. Jung was "communicative and relentless," offering his deep expertise to help complete a pitch deck within two weeks. *Id.* at 29. Mr. Beginin was so impressed that he kept Mr. Jung on as a freelance consultant for another five months, during which Mr. Jung "produced an essentially incontestable valuation model" and "guided [the] company all the way to a successful funding." *Id.* Mr. Beginin is no less than glowing about Mr. Jung and the impact he had: "[w]ithout Steve's involvement, I can definitely

say funding wouldn't have happened or we would've been eaten alive for our lack of sophistication in an unfamiliar industry."  *Id.*

Other letters describe the value that Mr. Jung has provided through his consulting business. *See, e.g.*, Ex. C at 55, Letter from A. Milinchuk (describing how Mr. Jung offered "a very low pay rate," and "went above and beyond in delivering exceptional results" for Mr. Milinchuk's company, FarmTogether, which seeks to democratize access to farmland.).

This is a very different experience than working at a leading global investment bank.  Mr. Jung is his own boss and has the freedom to take on projects he thinks are worthwhile, even if the are less profitable.  As Mr. Beginin put it: "His downfall may be a windfall for others, like me and my business, who couldn't afford, much less come in contact with, someone with his extraordinary intellect, lofty credentials and incredible work ethic."   Ex. C at 29, Letter from M. Beginin.  Mr. Seo describes a situation in which the business was advising a promising startup founded by a cancer survivor.  Ex. C at 27, Letter from R. Seo. The founder was unable to pay the regular rate, so Mr. Jung agreed to take a significantly reduced rate, and considered an arrangement by which he would be paid if and when the company received funding.  *Id.*  Mr. Jung wanted to make sure that this was legal from a securities regulation perspective, given his situation and prior experience. *Id.*  After consulting with multiple attorneys, Mr. Jung decided that he was in a gray area, and restructured the contract so that he would be paid up-front at a modest rate that was 80% discounted.  *Id.*  To Mr. Seo, this experience shows both that Mr. Jung has learned his lesson, takes the law very seriously, and will be extra diligent moving forward.  It also shows that Mr. Jung remains willing, through his business, to help others even if it is not particularly profitable.  *Id.*

Mr. Jung has also found ways to empower others through his startup.  Mr. Jung recognizes that if he is asking for a second chance, others deserve the same.  As a result, he has sought out

opportunities to employ individuals with criminal records as freelance consultants, through a website called Jobs for Felons Hub.  As one of these individuals that Mr. Jung has hired for multiple freelance projects put it, this work is "the reason I can put a roof over my family's heads and food on the table."  Ex. C at 33, Letter from R. de Rijke; *see also* Ex. C at 63, Letter from of D. Horton.  Mr. Jung has also employed a stay-at-home mother, and Mr. Jung "went out of his way to give [her] full flexibility to work remotely and at her own pace so she could spend the time needed with her kids while earning extra income."  Ex. C at 27, Letter from R. Seo.

Mr. Jung's consulting business is an immense point of pride for him, in that he has been able to support himself while also serving as a vehicle to help others.  And he has good reason to be proud.  Mr. McCambridge explains that Mr. Jung's work is important: "We need more advocates like him, at a time when oligopolists use anti-competitive practices, regulatory capture, and capital markets to crowd out innovators and job creators."  Ex. C at 38, Letter from J. McCambridge.  Jessica So, another friend from Wharton, sums it up well when she says: "Not many of us would have the strength to reinvent ourselves, but Steve is working really hard to contribute back to society."  Ex. C at 43, Letter from J. So.  "He has built the business from the ground up and now has 6 employees, most of whom are stay-at-home moms and former convicts."  *Id.*

### F.  Mr. Jung's Character

Mr. Jung's genuine goodness shines through the dozens of letters submitted on his behalf.  As one court explained:

> [I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had

in mind when it directed courts to consider, as a necessary sentencing factor, the history and characteristics of the defendant.

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (internal quotations omitted).  Family and close friends from around the world wrote to share with the Court their impressions of Mr. Jung, and relay anecdotes that reveal his extraordinary character.

A few common themes stand out in these letters.  First, Mr. Jung is above all else, consistently devoted to his friends and family.  Second, Mr. Jung is a fundamentally selfless person.  There are countless examples of Mr. Jung dedicating his time and energy to helping others. These qualities have left a measurable impact on many people in Mr. Jung's life, as the letters demonstrate.  Third, Mr. Jung has an extraordinary work ethic.  While his criminal case has ended a chapter of his career, his friends and family have no doubt that he will continue to contribute positively to society.  His resiliency and successful ventures after the arrest, and his conscious effort to employ his startup for good, speak volumes about his character.  Finally, Mr. Jung takes complete responsibility for his conduct and is deeply remorseful.

First and foremost, Mr. Jung lives for his family, and in particular, for his wife.  Mr. Jung is a man who is ready and willing to drop everything for a casual friend or even a stranger, to the point where he is often stretched thin.  It is no surprise, then, that he is acutely dedicated to those closest to him.  As described above and as described fully in Ms. Jung's letter, Mr. Jung is an adoring husband who puts her first in every respect.  She also paints a picture of a man that is dedicated to his family, almost to a fault, and that she has simply come to accept his "obsession" as "part of his deep core."  Ex. C at 2, Letter from J. Jung.  This is true even when it leads to grief and arguments in the marriage, caused by late night calls with both sets of parents at Mr. Jung's insistence, or his insistence on providing emotional and practical support to the entire family.

21

Mr. Jung's dedication to his family is also clear from his commitment to his brother.  As long-time friend Gwang-Min Kim notes, Mr. Jung has a "special affection" for his younger brother and has tried his entire life to take his brother under his wing.  Ex. C at 36, Letter from G. Kim. Another friend from South Korea, James Uhm, explains that Mr. Jung made a concerted effort to take care of his brother, "going out of his way to make Sean feel comfortable and included."  Ex. C at 71-72, Letter from J. Uhm.  Yet another, Joon-Yeop Lee, explains in detail the ways in which Mr. Jung "took special care of his brother," and acted more like a parent than a sibling.  Ex. C at 83-84, Letter from J. Lee.  Indeed, it was the desire to motivate and engage his brother that led to the trading discussions that Mr. Jung should have avoided.

Mr. Jung's in-laws describe Mr. Jung as "uncommonly" concerned for them, and as an immense help to their son (Mr. Jung's brother-in-law).  Ex. C at 20, Letter from M. Eom and T. Jung.  They see that Mr. Jung cares for his extended family just as he cares for his wife and parents. While it might be the embodiment of a nightmare for many, or at least the premise of a sitcom, Mr. Jung has "suggested that [the family] build a big house for our two families so that we can all live together someday."  *Id.* at 21.  That is just the type of person that Mr. Jung is.

Mr. Jung's selflessness has been a core tenet of his personality since childhood.  "[Steve's] selflessness is probably his number one defining characteristic – in my mind." Ex. C at 119, Letter from W. Shu.  "Steve is the type of person who offers to pick up groceries for an elderly neighbor, gives up his seat to a pregnant person on a crowded train, and volunteers to take care of a friend's child when the baby sitter cancels at the last minute."  Ex. C at 44, Letter from K. Kim.  "This trait has always remained consistent . . . when you ask for Steve's help, he does not hesitate to go above and beyond []."  Ex. C at 73, Letter from J. Kim.

22

Mr. Jung's selflessness manifests itself in many ways.  As Steve's friend of 24 years, Gwang-Min Kim recalls, while the two were middle-schoolers, Steve put himself in physical danger when Mr. Kim was being robbed by an adult.  *See* Ex. C at 35, Letter from G. Kim.  Mr. Jung is a person who is "eager to help with a mentality of paying it forward," in ways large and small, whether by walking people home to make sure they got home safely after nights out in graduate school, or carving out time to meet with friends to discuss their careers.  Ex. C at 61, Letter from D. Kim.  As a result, friends recall Mr. Jung being by their side as they faced personal problems (Ex. C at 56, Letter from A. Milinchuk), adjusted to new cities (Ex. C at 48-49, Letter from M. Lee), or needed advice and guidance with respect to their careers (Ex. C at 81, Letter from J. Song).

Mr. Jung's selflessness is also evident through his commitment to charity and volunteer work, which has been important to Mr. Jung since he was a young man and remains important to him today.  Longtime friend Katie Song recently founded a charity fund and was touched when Mr. Jung provided her with free consultation that proved "invaluable" in her "first steps for fund raising."  Ex. C at 93, Letter from K. Song.

Mr. Jung has donated time and money to a number of charitable causes.  Mr. Jung has a passion for mentoring, nurturing, and teaching, and has followed through on that passion not only at Wharton but in many charitable endeavors before and after.  While still living in South Korea, Mr. Jung taught weekly classes and prepared case studies and lecture materials for a Business Studies Club at KAIST, Korea's leading engineering university.  *See* Ex. C at 95, Letter from K. Kwan.  He also volunteered as a weekend instructor at the Aranya School, a middle school in South Korea for students that were ostracized and bullied.  After his arrest, he joined the Board of Directors at RRR Computer, a local non-profit that provides computers to underprivileged

students.   Mr. Jung has also helped a number of non-profits develop presentation materials, including the Hawaii Rise Foundation, Oakland Natives Give Back, and the Other Side Academy. On Mr. Jung's most recent birthday, he and his wife spent the morning preparing and delivering food for the homeless.   Ex. C. at 5, Letter from J. Jung.   Mr. Jung is constantly brainstorming how to help those less fortunate and thinking of ways that he can provide an impact.

A friend summed it up well, writing that "[Steve's] commitment to take care of his loyal wife Janice, his unswerving mission to serve underprivileged people in our community, his resilience and his positive attitude toward the hardship in life are inspirational."   *See* Ex. C at 54, Letter from A. Huang.

It is also abundantly clear that Mr. Jung is an extraordinarily hard worker.   From his early education on two continents, to the most prestigious university in South Korea, to Wharton, at Goldman, and in his consulting business today, Mr. Jung has worked tirelessly.   "Steve got where he was by working hard his entire life, by putting in the extra effort, and working extremely punishing hours for himself and his family."   *See* Ex. C at 60, Letter from D. Araujo.   As the PSR notes, Mr. Jung "squandered years of hard study in school, tireless years of professional development, and forfeited his ability to work in what was a promising and lucrative career in investment banking."   PSR at 20.   In this way, Mr. Jung will have to live with his actions for the rest of his life.   But to his great credit, Mr. Jung responded by working even harder to get his company off the ground and reinvent himself.

Because he is such a hard worker and because they believe in his character, a number of letters written by successful professionals indicate that they would jump at the chance to work with Mr. Jung in the future.   Hansol Jung, the CEO of a real-estate development company in South Korea, remarks that he has "so much respect and undying trust in Woojae Jung's character, life

and attitude that if he were to return from America to Korea, [he] would propose to [Mr. Jung] that [they] work together," and that many of Mr. Jung's friends in South Korea feel similarly. Ex. C at 67, Letter from Hansol Jung.  Mr. Jung has also recently been offered a position at a startup company, on the recommendation of a client he has done consulting work for.

Finally, the materials available to the Court show that Mr. Jung is deeply remorseful.  First and foremost, Mr. Jung expresses his sincere regret in his letter to Your Honor.  *See* Exhibit B, Letter from Woojae (Steve) Jung.  The Probation Department also found that Mr. Jung was remorseful after interviewing him.  PSR ¶ 25.   Mr. Jung's accountability and regret were also cited over and over again in his letters of support.  We will not endeavor to cite to each instance, but we note that many of these letters come from accomplished professionals with impressive backgrounds and careers – individuals that would not throw their support behind a person that they did not truly believe was remorseful.  *See, e.g.*, Ex. C at 91-92, Letter from J. Lee (Managing Director at Bain Capital, describing being shocked and disappointed but believing that Mr. Jung is remorseful and that this is an aberration from his typical character).   Many individuals are frustrated or disappointed with Mr. Jung for putting himself in this situation.  All, however, have stuck by his side because they are completely confident in the content of his character.

Perhaps the best example is Randall Drain, Jr., who comes from a law-enforcement background, initially found it difficult to reconcile his respect for Mr. Jung with his wrongdoing, and admits that he was "put off by the whole thing."  Ex. C at 50, Letter from R. Drain Jr.   Mr. Drain notes that it is "easy to be sorry, particularly when exposed," but that after a conversation with Mr. Jung, he was happy to support him, because rather than blaming others, hiding behind the relative impact of his crimes, or making excuses, Mr. Jung "owned his mistake."  *Id.*  Mr. Drain sees Mr. Jung's ownership as important, but also as consistent with his character: "Steve owns this

25

experience just as much as he does those that reflect more favorably on him," and "sees all his actions, whether they be commendable or regrettable, as an opportunity for him to learn and grow." *Id.* at 51.

For all of these reasons, the Court can be certain that Mr. Jung will continue to do good for his family, friends and others if permitted to remain in the community.  Mr. Jung is exceptionally kind-hearted, and generous with his time and his resources.  He is committed to redoubling those efforts moving forward.

### G.  Specific Immigration Circumstances

Mr. Jung is a Korean citizen, and his immigration circumstance merits specific discussion given the impact of the instant conviction, and the impact of the Court's sentence.  Mr. Jung's immigration counsel has submitted a Declaration which sets forth in detail the relevant facts and circumstances.  *See* Exhibit D, Declaration of John Sandweg.

In sum, Mr. Jung's immigration circumstances mean that he will soon lack status and be deportable.  Mr. Jung can seek a discretionary waiver of deportation, and whether Mr. Jung is to be detained while that application is pending (separate and apart from any term of incarceration Your Honor imposes) will depend in large part on the sentence that the Court imposes.  Further, Mr. Jung's immigration status means that any period of incarceration will likely be more restrictive and longer than if he were a citizen.  We describe Mr. Jung's immigration circumstances in greater detail below.

Mr. Jung was lawfully admitted to the United States on an H1-B employee visa and is currently an applicant for adjustment of status as a derivative beneficiary of his wife's approved employment-based immigrant sponsorship petition filed by her employer, which made her a lawful permanent resident. *Id.*  Mr. Jung's adjustment application will almost certainly be denied based

on his conviction, post-sentencing, and as a result, Mr. Jung will lack legal immigration status, become deportable, and be taken into immigration custody at the conclusion of any term of incarceration. *Id.*

At that point, Mr. Jung's only chance to remain in the U.S. with his wife is to seek a discretionary waiver due to the hardship his deportation would cause his wife. *Id.* Whether Mr. Jung would remain in immigration custody during pendency of removal proceedings will depend, "in large part, on the sentence he receives" in this case. *Id.* at 10. If Mr. Jung is sentenced to a term of incarceration of a year or more, he will be ineligible for release, and remain in ICE custody until his waiver request was granted or until he was deported. *Id.* Due to the backlog in immigration courts, this would likely drag on for months, and as a result, Mr. Jung would spend an additional several months in ICE custody. *Id.* If, on the other hand, the sentence was for less than a year, Mr. Jung would not be subject to mandatory detention during the pendency of his removal proceedings. *Id.*

In addition, Mr. Jung's immigration status means that any term of incarceration will be comparatively onerous. Ordinarily, a non-violent, first time offender would be eligible to be assigned to a minimum-security prison "camp." However, because Mr. Jung will be classified by the Bureau of Prisons as a "Deportable Alien," he will be designated at least a "low-security" rather than a "minimum-security" inmate. This difference has a stark impact, from restrictions on inmates, quality of life due to crowding and the scope of visitation rights, and perhaps most importantly, the danger posed by other inmates. There is also a significant risk that if sentenced to any term of imprisonment, Mr. Jung will be designated to a privatized prison due to his alien status. These privatized institutions house serious, violent offenders, and Mr. Jung would find himself in an environment far different than a non-alien who committed a similar offense and

27

lacked a criminal background would.  Finally, Mr. Jung's immigration status means that he is ineligible for any early release or partial home confinement programs, which means that his sentence will be functionally longer than someone similarly situated.

## VI.  A SENTENCE OF TIME SERVED IS SUFFICIENT BUT NOT GREATER THAN NECESSARY IN THIS CASE

### A.  Federal Sentencing Framework

The sentence imposed on Mr. Jung should be driven by the "overarching" command of 18 U.S.C. § 3553(a), which "instruct[s] district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing."  *United States v. Collado*, 2008 WL 2329275, at *3 (S.D.N.Y. June 5, 2008) (quoting *Kimbrough v. United States*, 552 U.S. 85, 89 (2007) (internal quotation marks omitted)).  The Guidelines are advisory and in no sense does a Guidelines calculation engender a presumption that the attendant sentence is appropriate, let alone required.  *See, e.g*, *United States. v. Davis*, No. 07 Cr. 727, 2008 WL 2329290, at *4 (S.D.N.Y. June 5, 2008) (citing *Gall v. United States,* 552 U.S. 38, 45 (2007)).  In fact, courts "may not presume that the Guidelines range is reasonable" at all or that only "extraordinary circumstances . . . justify a sentence outside the Guidelines range."  *United States v. Cavera*, 550 F.3d 180, 189, 199 (2d Cir. 2008) (quoting *Gall,* 552 U.S. at 47); *see Nelson v. United States.*, 555 U.S. 350, 350 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable."); *Rita v. United States,* 51 U.S. 338, 351 (2007) ("[S]entencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

While the Court is instructed to use the Guidelines as an initial benchmark, they are only "one factor among several" that the Court should consider, and can and should play no role in the sentencing decision when doing so would undermine Federal sentencing objectives. *Kimbrough*, 552 U.S. at 90.  As the Second Circuit has explained:

> the district court must form its own view of the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The sentencing judge is directed, moreover, to consider: a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation. *Id.* § 3553(a)(2). Additionally, district courts must take into account: the kinds of sentences available, *id.* § 3553(a)(3); any pertinent Sentencing Commission policy statement, *id.* § 3553(a)(5); the need to avoid unwarranted sentence disparities among similarly situated defendants, *id.* § 3553(a)(6); and, where applicable, the need to provide restitution to any victims of the offense, *id.* § 3553(a)(7).

*Cavera*, 550 F.3d at 188-89.  It follows that courts may consider whether a Guideline sentence does not reflect the considerations outlined in § 3553(a), reflects an unsound judgment, does not treat defendant characteristics in the proper way, or that a different sentence is otherwise appropriate. *Rita*, 51 U.S. at 350-51.  Judges also "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines."  *Kimbrough*, 552 U.S. at 101.

In sum, to fulfill its duty, the Court must conduct its own "independent review of the sentencing factors, aided by the arguments of the prosecution and the defense" and exercise discretion in fitting the sentence in this case to Mr. Jung's individual circumstances, giving "consideration [to its] own sense of what is a fair and just sentence under all the circumstances." *See Cavera*, 550 F.3d at 189; *United States v. Jones,* 460 F.3d 191, 195 (2d Cir. 2006).  To be sure, "the amount by which a sentence deviates from the applicable Guidelines range is not the measure of how 'reasonable a sentence is.'"  *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (citing *Gall,* 552 U.S. at 46-47).  Rather, "[r]easonableness is determined instead by the district court's individualized application of the statutory sentencing factors."  *Id.*

Application of these factors in this case strongly support a sentence of time served.

### B.  Mr. Jung Accepts the PSR's Advisory Guideline Calculation

Pursuant to the parties' plea agreement and the PSR, Mr. Jung's offense level is as follows:

| | |
|---|---|
| 2B1.4(a) – Base Offense Level: | 8 |
| 2B1.1(b)(1)(E) – Amount of gain more than $95,000 but less than $150,000: | +8 |
| 3B1.3 – Abuse of position of trust | +2 |
| 3E1.1 – Timely acceptance of responsibility | -3 |
| TOTAL OFFENSE LEVEL = | 15 |

PSR ¶¶ 26-36.  Because Mr. Jung has no prior criminal history, his criminal history score was calculated as zero, placing him in criminal history category I.  PSR ¶ 39.  Accordingly, the applicable Guidelines range is 18-24 months.  PSR ¶ 70.  However, the PSR ultimately recommends a sentence of time served, with a term of supervised release of two years, and a special condition of 240 hours community service.[2]

### C.  The PSR Recommends Time Served

As discussed above, the PSR recommends a significant downward variance from the advisory Guidelines range.  The PSR's recommendation is well-reasoned and should be adopted. In making this recommendation, the Probation Department highlighted many of the same themes we have attempted to draw the Court's attention to in this submission:

- That Mr. Jung has lived a "law-abiding lifestyle" and that his offense was "more of an aberration" than "reflective of a criminal mindset."  PSR at 20.

- That as is, Mr. Jung has "squandered years of hard study in school, tireless years of professional development, and forfeited his ability to work in what was a promising and lucrative career in banking."  *Id.*

---

[2] In addition to the $130,000 forfeiture provided for in the plea agreement, the PSR recommends a monetary fine of $30,000.

- That Mr. Jung has "already used his strong educational and professional background, as well as his motivation and resilience to reinvent himself and start his own business." *Id.*

- That Mr. Jung's charitable work has been impressive. *Id.*

- That Mr. Jung benefits from the support of his spouse and poses little risk of recidivism. *Id.*

- That a non-custodial sentence as recommended, including a significant monetary fine and substantial community service component, would account for the seriousness of the crime and allow Mr. Jung to pay for his actions. *Id.*

In addition, the Probation Department's view was informed by Mr. Jung's presentence interview, during which he expressed remorse and regret and described his recent charitable endeavors, as well as a conversation with Ms. Jung, in which she expressed complete support for her husband. *Id.* at ¶¶ 25, 49.

We believe that the PSR's recommendation is telling – based only on a limited window into Mr. Jung's life, the Probation Department came to the view that a non-custodial sentence was sufficient in this case. We submit that the Court should adopt the PSR's recommendation and reach the same conclusion.

### D. A Downward Variance from the PSR's Guidelines Calculation is Warranted Under Title 18, United States Code, Section 3553(a)

#### 1. Mr. Jung's Personal History and Characteristics Warrant Downward Variance

The person that would be impacted most negatively by any custodial sentence is Ms. Jung. As she describes in her letter, she is "beyond fearful of the possibility of him being taken away," and is "afraid from the deepest of [her] heart that [she] will sink into an abyss as soon as Steve is not with [her]." Ex. C at 3, Letter from J. Jung.

Ms. Jung's family is deeply concerned about the impact that any custodial sentence would have on Ms. Jung.  "Everyone in the family is very worried about this, and the more we think about it, the more it causes us concern."  Ex. C at 21, Letter from M. Eom and T. Jung.  As her parents explain, Ms. Jung ████████████████████████████████████████████ ████████████████████████████████████ *Id.*  They fear that ███████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████ *Id.*  Ms. Jung's brother is also "deeply worried about how [Ms. Jung] would cope," explaining that Mr. Jung's "absence would take a huge toll on her emotionally and psychologically."  Ex. C at 24, Letter from Yeon Sang Jung.

The couple's mutual friends are concerned as well, both because any incarceration "will immediately bring lots of pain to Janice" and because of the "strain on their relationship which the couple has worked so hard to save."  Ex. C at 45, Letter from K. Kim.

As is, Mr. and Ms. Jung will find themselves in a very difficult situation due to the immigration consequences that may result from Mr. Jung's conviction.  As described above, Mr. Jung's conviction makes him facially deportable, and he will need to seek a waiver to have any chance to stay in the U.S. long term.  A significant term of imprisonment would mean that Mr. Jung would be detained while the waiver process unfolds, which would functionally add significant time to his sentence, and make the circumstance all the more difficult on his wife.  In addition, and as previously described, Mr. Jung's immigration status means that any term of imprisonment will be longer and more onerous than another individual in his situation would ordinarily serve.

In addition, especially given the important work that Mr. Jung is doing through his business, and his significant philanthropic efforts, the community will be negatively impacted by Mr. Jung's absence.  For example, Mr. Jung is actively employing individuals who might otherwise find it difficult to obtain similar opportunities, and providing value, every day, to small businesses.  Further, Mr. and Ms. Jung regularly donate their time and money to various charitable causes.

Mr. Jung's family, and society at-large, will be better off if Mr. Jung is permitted to serve a non-custodial sentence.

### 2.   The Offense Conduct Did Not Result in Personal Gain to Mr. Jung

The $130,000 in gain associated with the offense has resulted in no personal gain to Mr. Jung.  Indeed, the funds remain in the Interactive Brokers account through which the trading took place, which is not held in Mr. Jung's name, and which, per the plea agreement, he has expressly surrendered any ownership interest in.  Courts consider the fact that a defendant received no personal gain, or limited personal gain, in sentencing.  *See United States v. Walters*, 87 F.3d 663, 671-72, n.8 (5th Cir. 1996) (affirming downward departure where loss calculation "overstates the seriousness of the particular defendant's conduct" as defendant "fail[ed] to receive a personal benefit" from the scheme); *United States v. Oakford Corp.*, 79 F. Supp. 2d 357, 368 (S.D.N.Y. 1999) (finding that Guidelines overstated seriousness of offense where "each of the defendants personally realized only a small portion of the overall gain or profits" from scheme); *United States v. Stuart*, 22 F.3d 76, 82-83 (3d Cir. 1994) (finding that a nine-level loss enhancement may overstate defendant's criminality because he only personally received a maximum of 1.6% of the government's loss figure).

### 3.   The Offense Conduct Is Inconsistent with "Typical" Insider Trading

While Mr. Jung in no way seeks to minimize the seriousness of the offense, the facts point to something other than a typical insider trading scheme and should counsel the Court toward leniency.   As a Goldman employee, Mr. Jung had access to significant material non-public information, including the dates of announcement of deals, and how those deals were priced.   Had Mr. Jung wanted to provide specific information to his brother so that they could "cash in," he could have done so.   The trading at issue shows something different and supports Mr. Jung's explanation of the conduct.

The PSR provides a table that shows the gross profit by transaction with respect to the conduct alleged along with the dates of the relevant sales.   PSR ¶ 17.   In multiple instances, the gross profit is quite small under the circumstances: $362 on one transaction, $860 on another. Some are larger, but the largest is $64,000 dollars.   These amounts are inconsistent with a theory that the tipper provided specific deal information so that the recipient could monetize that specific deal information.   Simply put, given Mr. Jung's access to specific insider information on these deals, one would expect to see more meaningful execution and larger profits if the intent was to monetize the actual deal information.

In many instances, the timing of the transactions, or buys and sells in the same company, suggest that the trader was not acting on specific or precise information.   For example, with respect to SanDisk, trading records show that a significant portion of the position was sold off prior to the deal ever being leaked or announced, which is inconsistent with knowledge of an impending deal. Similar details that show that the trading was inconsistent with specific deal information exist for many of the transactions that are part of the offense conduct.   In this respect, the Indictment and the PSR do not paint the full picture.

Mr. Jung had discussed trading strategies with his brother, including taking one or two-directional options positions in companies in advance of earnings.  Mr. Jung provided a list of companies in sectors he knew well to his brother, and as he admits, continued to discuss some of those companies with his brother when he should not have.  But the trading that underlies the offense conduct is inconsistent with sharing specific deal information.  Mr. Jung fully recognizes that any dissemination of any non-public information that would tend to provide a trading advantage is illegal, but we believe that these facts are relevant to the Court's consideration regarding the nature and seriousness of the offense.

4.  A Sentence of Time Served Satisfies Federal Sentencing Objectives Under
    18 U.S.C. § 3553(a)(2)

The defense's proposal is consistent with the PSR's recommendation and satisfies federal sentencing objectives, including respect for the law and adequate deterrence.  Specific deterrence of Mr. Jung is unnecessary in this case, where Mr. Jung will never work as an investment banker or in the securities industry again.  The crime at issue was "particularly adapted to his chosen career" and "[t]hat career is over."  *United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) (finding no chance of recidivism because defendant's career was over).  Mr. Jung poses no societal risk and need not be deterred from engaging in any similar conduct in the future.

Deterrent interests have also already been served by Mr. Jung's well-publicized arrest, indictment and guilty plea.  Market participants are certainly on notice that engaging in the offense conduct may subject them to criminal process and prison.

**CONCLUSION**

Steve Jung understands fully that he stands convicted of a federal crime and that this conviction will have consequences.  The arguments that we advance on his behalf do not in any

way seek to diminish the actual seriousness of the crime for which he has been convicted.  We ask the Court, however, to take into account Mr. Jung's character, his profound remorse, and the adverse impact of any custodial sentence on a young family, under the circumstances.  Mr. Jung is a productive member of society, actively helping small businesses, creating jobs for people that might otherwise have difficulty generating income, and continuing to commit himself to volunteer efforts.  Mr. Jung makes his community a better place.  The absence of personal gain, the facts of the offense, and Mr. Jung's personal circumstances including the likelihood of severe adverse immigration consequences, are powerful mitigating factors that counsel moderation in the imposition of a sentence.  For these reasons, the Court should sentence Mr. Jung to time served.

Respectfully submitted,

By:   ___/s/_____
Patrick J. Smith
Nicholas J. Karasimas
SMITH VILLAZOR LLP
250 West 55th Street, 30th Floor
New York, New York 10019
(212) 582-4400

*Attorneys for Defendant Woojae Jung*

36