

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

June 3, 2019

**BY ECF**

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re: *United States v. Woojae Jung*, 18 Cr. 518 (LAK)

Dear Judge Kaplan:

      The Government respectfully submits this letter in advance of Wooaje Jung's sentencing, scheduled for June 10, 2019. Jung pled guilty to securities fraud in the form of insider trading, in violation of Title 15, United States Code, Section 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5. For the reasons set forth below, the Government believes that a sentence within the stipulated Guidelines sentencing range of 18 to 24 months' imprisonment is reasonable and appropriate in this case.

      **A. Factual Background**

      In July 2012, Woojae Jung began working as an investment banking associate in the Natural Resources group at an investment bank based in New York, New York (the "Investment Bank"). In late August of 2015, Jung transitioned to the Technology, Media, and Telecommunications Group of the Investment Bank, in San Francisco, California, rising from associate to vice president at the start of 2016. Jung remained in this position until June 15, 2018. *See* Presentence Investigation Report dated March 13, 2019 ("PSR"), ECF Doc. 36 ¶ 13.

      The Investment Bank staffed Jung to assist clients on various transactions, primarily mergers and acquisitions ("M&A deals"). Jung's clients were often publicly traded companies. Sometimes, Jung worked on behalf of a company that planned to acquire another and sometimes on behalf of a company that was considering being acquired. PSR ¶ 14.

      On any given M&A deal, Jung typically worked within a team of other Investment Bank employees, often referred to as the "deal team." The deal team was tasked with advising the firm's client in connection with a potential transaction. This involved reviewing and analyzing

various financial and operational data and information. As a result, in the regular course of his work, Jung received material, non-public information about numerous companies, including that they were working to acquire other companies, or were acquisition targets. PSR ¶15. Investment Bank had trained Jung not to trade in securities on the basis of material, non-public information and Jung understood that the Investment Bank required him to keep information about the firm, its clients, and upcoming transactions confidential. In addition, Investment Bank required Jung to disclose his stock trading and to use a pre-cleared brokerage account.

Starting in early 2015, Jung began to discuss stock trading strategies with his younger brother, who lived in South Korea. Jung and his brother ultimately devised a scheme. PSR ¶ 16. They opened a brokerage account in the name of one Jung's college friends and concealed the existence of the account from the Investment Bank. Based on materials he obtained through his work, Jung would then tip his brother about deals. Jung's brother would then typically execute the trades in the brokerage account, though at least once the trades were executed from a computer associated with the Investment Bank. Jung also repeatedly accessed and used the brokerage account during the trading scheme. PSR ¶ 16.

From their trading, Jung and his brother amassed $130,000 in profits. PSR ¶ 18. Their trades included trades in the stock of numerous companies:

- Fairchild Semiconductor International, Inc.
- FEI Company
- Nimble Storage Inc.
- NXP Semiconductors NV
- WebMD Health Corp.
- WR Grace
- Foresight Energy
- SanDisk
- KLA-Tencor
- Microsemi
- CA

Two trades—SanDisk and KLA-Tencor—accounted for the bulk of the trading profits, with trades in SanDisk yielding $36,663 and trades in KLA-Tencor yielding $64,000.

**B. Procedural History**

On May 30, 2018, the Government charged Woojae Jung with one count of securities fraud conspiracy, in violation of 18 U.S.C. § 371, and six counts of securities fraud in the form of insider trading, in violation of 18 U.S.C. § 78j(b) and 17 C.F.R. 240.10b-5.

On May 31, 2018, special agents with the Federal Bureau of Investigation arrested Jung out-of-district. *See* ECF Docket Entry dated May 31, 2018. On June 22, 2018, Jung was presented in the Southern District of New York before the Hon. Henry B. Pitman, U.S. Magistrate Judge.

On July 23, 2018, a grand jury returned Indictment 18 Cr. 518 (LAK), charging Jung with one count of securities fraud conspiracy, in violation of 18 U.S.C. § 371, and six counts of securities fraud in the form of insider trading, in violation of 18 U.S.C. § 78j(b) and 17 C.F.R. 240.10b-5. *See* ECF Doc. 7.

On December 19, 2018 Jung appeared before the Honorable Debra Freeman, U.S. Magistrate Judge for a change-of-plea proceeding. Pursuant to an agreement with the Government, Jung allocuted to insider trading, in violation of Title 15, United States Code, Section 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, as charged in Count Five of the Indictment. During his allocution, Jung admitted that (a) he had access to material, non-public information by virtue of his employment at a particular investment bank, *see* Plea Tr. 24:06-10; (b) his employer required that such information be kept confidential, *see* Plea Tr. 24:03-05; and (c) that, in violation of his duty of confidence, Jung caused another person to execute securities trades based on Jung's material, non-public information, *see* Plea Tr. 25:10-17, 27:21-23. Jung specifically admitted that he recommended that another person execute trades in KLA-Tencor stock—the transaction discussed in Count Five—based on Jung's knowledge that KLA-Tencor was involved in an impending but unannounced merger and acquisition. *See* Plea Tr. 26:15-27:14. Jung further admitted that he knew that what he did was wrong and against the law. *See* Plea Tr. 28:03-06. This Court accepted Jung's guilty plea on January 28, 2019. *See* ECF Doc. 29.

The Plea Agreement contained a guidelines calculation that the parties agreed was applicable to the instant offense (the "Stipulated Guidelines Range"). Using the November 1, 2018 Guidelines Manual, the Plea Agreement calculated an offense level of 15 based on the following analysis: (i) pursuant to U.S.S.G. § 2B1.4(a), a base offense level of 8; (ii) pursuant to U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(E), an 8-level because the gain derived from the offense was more than $95,000 but less than $150,000; (iii) pursuant to U.S.S.G. § 3B1.3, an increase of 2 levels because Jung abused a position of trust; and (iv) pursuant to U.S.S.G. § 3E1.1, a 3-level reduction to reflect Jung's timely acceptance of responsibility. At criminal history category I, the Stipulated Guidelines Range was 18 to 24 months' imprisonment.

The Plea Agreement also contained the parties' agreement that Jung would forfeit a sum of money equal to $130,000 in United States currency.

The United States Probation Office computed the same Guidelines range as the parties had in the Plea Agreement. PSR ¶¶ 26-36 (calculating an offense level of 15), ¶¶ 37-39 (calculating a criminal history score of zero). The PSR recommends a sentence of time served, to be followed by two years' supervised release, reasoning that Jung poses little risk of recidivating and the seriousness of the crime can be addressed through community service and monetary penalties. *See* PSR at 20. Probation also recommends that the Court sentence Jung to 240 hours of community service and a $30,000 fine. *See* PSR at 19.

### C. Discussion

To promote respect for the law and to achieve general deterrence, the Government seeks a sentence within the Guidelines Sentencing Range of 18 to 24 months' imprisonment.

#### 1. Applicable Law

The Guidelines still provide strong guidance to the Court in light of *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range": that "should be the starting point and the initial benchmark." *Gall v. United States*, 55 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see* 18 U.S.C. § 3553(a)(2); "the kinds of sentences available," 18 U.S.C. § 3553(a)(3); the Guidelines range itself, *see* 18 U.S.C. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see* 18 U.S.C. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," 18 U.S.C. § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the

4

justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

### 2. A Sentence Within the Stipulated Guidelines Range is Reasonable

Here, a sentence within the Stipulated Guidelines Range is necessary, first and foremost, to promote respect for the law. Insider trading is a serious offense that undermines the public's confidence in fair and well-functioning capital markets.

Second, a sentence within the Stipulated Guidelines Range would be appropriate punishment in light of the circumstances of the offense and the defendant. Jung was a sophisticated, well-educated professional. When he committed insider trading, he deliberately misused information given to him in confidence by his employer's clients and did so notwithstanding specific training he had received on the topic. Further, and in order to conceal his conduct from his employer, Jung opened and used a trading account in the name of a college friend. Far from presenting "something other than a typical insider trading scheme," as Jung suggests in his sentencing memorandum, *see* Def. 33, the facts here show Jung to be a trusted insider who misappropriated his clients' information for his own purposes over a period of approximately two years. This type of embezzlement lies at the core of most insider trading cases. That Jung intended his brother to reap the financial benefit of what he had taken from the Investment Bank does diminish the wrongfulness of his conduct.

Further, regardless Jung's suggestion that he did not communicate particular deal information with his brother, the evidence shows Jung shared more than general trading strategies. On numerous occasions, trades were made in the brokerage account within days of Jung's first awareness of an impending deal. For example, Jung accessed the W.R. Grace files on February 3, 2015 and February 4, 2015, and trades were placed in the brokerage account on February 4, 2015; Jung accessed Foresight Energy deal files on March 12 and March 13, 2015, before trades were placed in the brokerage account on March 13, 2015; and Jung was in touch with Investment Bank employees working on the FEI Company deal on May 17, 2016, two days before trades were placed in the brokerage account in FEI Company shares on May 18, 2016. Further, not all of the trading can be attributed to Jung's brother. For trades in W.R. Grace stock, for example, none of the trades appear to be placed from Korean IP addresses and, to the contrary, resolve back to an IP Address associated with the Investment Bank. Further still, Jung repeatedly logged into the brokerage account during the scheme, including before and after many of the trades were executed by his brother in Korea. Jung's conduct is neither the most flagrant nor the most profitable insider trading activity the Court has seen, but his conduct still required a persistent deceit that warrants a judicial response.

Third, a sentence within the Stipulated Guidelines Range is necessary for general deterrence. The legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). General deterrence is seen as an important sentencing factor in fraud and white collar cases, because it is seen as effective.

*Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (quotation marks and citation omitted). A Guidelines sentence will appropriately signal to others contemplating insider trading that that their conduct will be met with serious punishment.

\* \* \*

To promote respect for the law, to deter others from engaging in similar dishonest conduct, and in consideration of all of the factors set forth in 18 U.S.C. 3553(a), the Court should impose a sentence within the Stipulated Guidelines Range of 18 to 24 months and order forfeit Jung's $130,000 in criminal proceeds.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: *[signature]*
Andrew Thomas
Assistant United States Attorney